IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANALICIA K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANALICIA K., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

REBECALICIA H., APPELLANT, AND BRYAN N., APPELLEE.

Filed January 9, 2024.    No. A-23-460.

Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

Douglas L. Kerns, Deputy Lancaster County Public Defender, for appellant.

Alisha Jimenez, Deputy Lancaster County Attorney, for appellee State of Nebraska.

RIEDMANN, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Rebecalicia H. appeals from an order of the separate juvenile court of Lancaster County adjudicating her daughter, Analicia K., under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). On appeal, Rebecalicia argues that the State failed to adequately demonstrate that Analicia was at risk of harm as a result of the faults or habits of Rebecalicia. Upon our de novo review of the record, we affirm the order of the juvenile court.

## BACKGROUND

Analicia was born in September 2013. Immediately after her birth, Analicia's meconium tested positive for methamphetamines and her umbilical cord blood tested positive for codeine. As a result, Analicia was immediately removed from Rebecalicia's care and custody. Tonya Chandler

- 1 -

and Ralph Chandler became her foster parents. Analicia was returned to Rebecalicia's care and custody in 2014, when she was a year old.

Shortly after Rebecalicia regained custody of Analicia, she reached out to Tonya to inquire if Tonya would be willing to provide daily care for Analicia at her in-home daycare. Tonya agreed. At times, the Chandlers also provided overnight childcare for Analicia when Rebecalicia needed additional help. By the time Analicia was three or four years old and was starting preschool, she resided primarily with the Chandlers and would have regular visits with Rebecalicia on the weekends. At first, the Chandlers considered their arrangement with Rebecalicia as "co-parenting a child [they] both loved." The Chandlers considered Rebecalicia's decision to leave Analicia with them as positive.

In 2019, when Analicia was almost six years old, she was diagnosed with Type I diabetes. Her condition requires that she be carefully monitored at home and that she be seen by her doctors on a regular basis. Because the Chandlers were never formally named as Analicia's legal guardians, they had to obtain signed delegation of authority documents from Rebecalicia every few months in order to be able to take Analicia to her medical appointments. However, as time passed, Rebecalicia's contact with the Chandlers and with Analicia dwindled. As this communication dwindled, the Chandlers began to struggle to obtain timely and complete paperwork from Rebecalicia. In October 2022, Ralph reached out to the Department of Health and Human Services (Department) to acquire assistance with obtaining the necessary paperwork from Rebecalicia after being unable to do so on his own. The Department contacted Rebecalicia and obtained the paperwork so that Analicia could attend a scheduled doctor's appointment.

In December 2022, shortly after being contacted by the Department, Rebecalicia went to the Chandlers home to see Analicia for the first time in approximately 10 months. Rebecalicia expressed a desire to take Analicia to a church service on Christmas Eve. While the Chandlers planned on allowing this, the Department intervened and suspended any visits between Rebecalicia and Analicia.

On December 23, 2022, the State filed a juvenile petition and a motion for temporary care and custody of Analicia. In its petition, the State alleged both that Analicia lacked proper parental care by reason of the fault or habits of Rebecalicia and that Analicia was in a situation dangerous to life or limb or injurious to her health or morals. Specifically, the State asserted that Rebecalicia had relinquished her parental rights to an older sibling of Analicia's after failing to correct the conditions which required the juvenile court's intervention; that Analicia had previously been adjudicated as a child within § 43-247(3)(a) as a result of Rebecalicia's use of controlled substances when she was pregnant with Analicia; that Rebecalicia has failed to maintain consistent contact with Analicia and her caregivers since November 2021; that Rebecalicia has failed to provide Analicia with safe, stable, and sanitary housing; and that Analicia is at risk of harm.

The juvenile court issued an ex parte order authorizing the Department to obtain temporary custody of Analicia. At a protective custody hearing held five days later on December 28, 2022, the juvenile court continued Analicia's custody with the Department, continued her placement with the Chandlers, and permitted Rebecalicia to have supervised visitation. On January 26, 2023, another hearing was held during which Rebecalicia denied the allegations in the petition. A formal adjudication hearing was scheduled for March 13.

On March 13, 2023, the adjudication hearing began. The State called two witnesses to testify: Tonya Chandler and Rebecca Bryant, the Department caseworker assigned to the case. Tonya testified in conformity with the events as described above. In addition, she testified more specifically as to her contact with Rebecalicia over the years and about Analicia's current circumstances.

Tonya testified that initially when Analicia began living with them, she would have contact with Rebecalicia often. Tonya was aware of where Rebecalicia was residing and had her telephone number. In turn, Rebecalicia had Tonya's telephone number. The two would send text messages and would speak on the telephone. In addition, Tonya would send Rebecalicia pictures of Analicia. However, in the past few years, Tonya's contact with Rebecalicia became more irregular. Tonya testified that often, Rebecalicia would not communicate with the Chandlers or check on Analicia even on a monthly basis. In fact, Rebecalicia has reached out to Tonya "less than 10 times" in the past few years. Rebecalicia has never provided direct financial support for Analicia since she began residing with the Chandlers. However, the Chandlers have provided financial assistance to Rebecalicia in times of financial need.

Tonya testified that despite Rebecalicia's lack of contact with them, she and Ralph always employed an "open door policy" for Rebecalicia at their home. They never refused any of Rebecalicia's requests to see Analicia. However, prior to December 2022, Rebecalicia had not visited with Analicia in over 6 months. In fact, since 2021, Rebecalicia has only visited with Analicia on four or five occasions. Oftentimes, a visit would be scheduled, but Rebecalicia would not attend. Rebecalicia failed to visit Analicia on her birthday in September 2022. Tonya described how Analicia sat in front of the window and cried for Rebecalicia on her birthday. On Analicia's birthday in 2021, Rebecalicia took Analicia to the grocery store for a few minutes, but did not otherwise celebrate with her.

During her testimony, Tonya explained the detrimental effect that Rebecalicia's absence from Analicia's life has had on Analicia's mental health. In 2019 or 2020, Analicia told Tonya that she believes that Rebecalicia hates her because she no longer comes to visit. When Tonya spoke to Rebecalicia about this, Rebecalicia acknowledged that she needed to do better. More recently, Analicia has exhibited "horrific" behavioral problems, including being physically aggressive with Tonya. Tonya attributes this behavior, in part, to Analicia's unstable relationship with Rebecalicia. Analicia does attend therapy, but Rebecalicia has never participated in this therapy despite Tonya's repeated requests for her to do so. Ultimately, Tonya testified that Analicia does much better when she knows when she will see Rebecalicia and Rebecalicia follows through with scheduled visits.

Tonya did acknowledge that Rebecalicia has struggled with her own mental health in the last year, after both her brother and her husband died. However, Tonya indicated that Rebecalicia's regular contact with Analicia ended "way before" these traumatic incidents.

Tonya described Analicia's current medical conditions during her testimony. As mentioned above, Analicia is a Type I diabetic who is insulin dependent. She was diagnosed in 2019 after Tonya urged Rebecalicia to take her to the doctor. Analicia was admitted to the hospital for an 8-day period, during which Rebecalicia visited one time when Analicia was sleeping. Tonya testified that managing Analicia's diabetes has become a "full-time job" for Ralph. Both Tonya and Ralph underwent training to utilize necessary medical devices for Analicia's diabetes.

Rebecalicia did not complete this training, only appearing for 15 minutes and then abruptly leaving.

In addition to diabetes, Analicia has also been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and reactive attachment disorder. Analicia is prescribed multiple medications for these conditions.

Bryant also testified on the first day of the adjudication hearing. She was assigned as the Department caseworker for Analicia in January 2023. Bryant testified that since January, Rebecalicia has not completed necessary training to manage Analicia's diabetes and her medical devices. Rebecalicia has been attending visits with Analicia. These visits are occurring at Rebecalicia's home, which Bryant indicated was "overall," not an appropriate space for Analicia to return to. Specifically, while the main floor of the home is relatively appropriate, Bryant has not been able to inspect the remainder of the home because there are always padlocks leading to the upstairs and the downstairs areas. Rebecalicia reported that these areas are off limits because of damaged support beams. Additionally, the back yard and front yard are cluttered with miscellaneous items. Rebecalicia identified one of the two bedrooms as belonging to Analicia. However, the room contained shot glasses and cigarette rollers.

The adjudication hearing continued on April 18, 2023. On this date, the State called Caroline Cote, an initial assessment worker employed by the Department to testify. Cote testified that she was first contacted by the Chandlers in October 2022 as a result of behaviors Analicia was displaying at school and as a result of the Chandlers needing a new delegation of authority for Analicia's medical appointments but being unable to reach Rebecalicia. During her testimony, Cote noted that this was not the first time the Department had to become involved with obtaining a delegation of authority from Rebecalicia for the Chandlers. In 2021, the Department became involved after the Chandlers reported that Rebecalicia was "unavailable" to sign needed consents.

The Department had also been involved with Rebecalicia and her older child in 2011. Such proceedings were initiated as a result of Rebecalicia's educational neglect, but later additional allegations of domestic violence in the home were included. In 2013, Analicia was added to the juvenile court proceedings as a result of testing positive for controlled substances at the time of her birth.

In October 2022, Cote went to Rebecalicia's home and found her outside. Cote testified that Rebecalicia was cooperative and conversational. She agreed to sign a delegation of authority to continue to allow the Chandlers to care for Analicia. Cote indicated that Rebecalicia acknowledged that the Chandlers had been caring for Analicia for some time:

> [Rebecalicia] knew it was in [Analicia's] best interest to be living with [the Chandlers] considering her current situation. [Rebecalicia] advised me that she had been working night shift and she needed Analicia to have structure. She knew that [the Chandlers] had been caring for her well and knew her medical needs and school needs and that it was just more of a structured environment for her to be with them.

After Cote's conversation with Rebecalicia, she learned that Rebecalicia was not actually employed and had not been employed for some time. Cote also learned that Rebecalicia had a history of facing prosecutions related to her involvement with controlled substances, most recently

in 2021. Cote was unable to complete an assessment of the inside of Rebecalicia's home to determine whether it was an appropriate environment.

Ultimately, the Department initiated formal proceedings in the juvenile court when Rebecalicia expressed a desire to see Analicia over the Christmas holiday in 2022. The Department's risk assessment revealed a high risk concerning unsupervised contact between Rebecalicia and Analicia. Cote testified that the Department's specific concerns included Rebecalicia's failure to timely provide the Chandlers with necessary authority to care for Analicia's medical needs; Rebecalicia's failure to obtain training to learn how to care for Analicia's diabetes; Rebecalicia's recent drug related criminal history; Rebecalicia's inability to provide a safe and stable environment for Analicia; and Rebecalicia's failure to follow through with promises she made to Analicia. Cote further explained:

Based on the conversations that I've had with [Analicia's] therapist, and his interpretation of that relationship between [Rebecalicia and Analicia], it was not a good idea for her to just return to [Rebecalicia's] care after so much time that she has been out of that environment. And for us to not have the ability to successfully assess [Rebecalicia's] home, whether we were inside the house or not, like, we just didn't have the evidence to suggest that she was a proper caregiver for [Analicia] at the time. And let alone the detrimental piece for [Analicia's] mental health and [Rebecalicia's] absence in [Analicia's] life that contributed to all of that. And just everything that contributed to where she's at and why she's with the Chandlers.

Even [Rebecalicia] to say herself that she didn't have the structure that Analicia needed and the reason why she let her stay with the Chandlers for so long and signed delegation of parental rights. For her to admit that herself, that it was a better environment for [Analicia], you know, speaks a lot to us. And we just – we didn't believe that [Rebecalicia] was ready to have [Analicia] back in her care without the proper training of her diabetic medical needs. Therapeutically, with all of [Analicia's] psychological diagnoses, and the overall absence of [Rebecalicia] in her life, inconsistency.

After Cote's testimony, the State rested and Rebecalicia called Ralph to testify. Ralph testified in conformity with Tonya's testimony as detailed above. He indicated that they have had very little contact with Rebecalicia since 2020. Analicia saw Rebecalicia on a few occasions in 2020, once in early December 2021, and once in February 2022. The February 2022 visit occurred after Analicia became physically violent and punched Tonya in the face. The Chandlers told Rebecalicia that they were struggling and she agreed to temporarily take Analicia to her home. However, she quickly returned Analicia to the Chandlers' home because her home did not have electricity.

Ralph detailed that when Rebecalicia came to their home in December 2022 to ask to see Analicia over the Christmas holiday, it was the first time she had seen Analicia in 10 months. And, although she promised to telephone Analicia later that night, she did not follow through with this promise. Ralph also testified that Rebecalicia does not attend Analicia's many doctor's appointments, therapy sessions, or educational meetings at her school. In addition, she has not provided any financial assistance for Analicia's care. Ralph stated that he and Tonya have a desire

to facilitate Analicia's relationship with Rebecalicia. They have "always made [Analicia] available to [Rebecalicia]."

During his testimony, Ralph explained that he reached out to the Department in October 2022 at the direction of Analicia's therapist. He felt that he and Tonya had done everything they could to make contact with Rebecalicia, but an updated delegation of authority form was two or three months overdue and Analicia had an upcoming appointment for her diabetes. They had tried reaching out to Rebecalicia's mother, Consuelo Escamilla-Gross, but learned that Rebecalicia was no longer in contact with her either.

The adjudication hearing resumed on May 17, 2023. At that time, Consuelo testified on Rebecalicia's behalf. Contrary to Ralph's testimony, Consuelo testified that during the period between November 2021 and December 2022, she always knew how to contact Rebecalicia. She also testified that while she had an ongoing relationship with Analicia while she was in the Chandlers' care, that she had not had any physical contact with Analicia since prior to November 2021.

Rebecalicia testified on her own behalf. She explained that after she regained custody of Analicia when she was a baby, she began using the Chandlers as daycare providers while she was working and going to school. Rebecalicia indicated that the Chandlers were happy to help her. Then, when Analicia started preschool, she began living with the Chandlers during the week and would stay with Rebecalicia on weekends and during school breaks. Rebecalicia believed this routine assisted with Analicia's behavioral problems.

When Analicia was diagnosed with diabetes, Rebecalicia was the one who took her to the emergency room. However, Rebecalicia left as soon as the Chandlers arrived because she had to go help take care of her adult son. When she would call to check on Analicia while she was in the hospital, the Chandlers would tell her everything was fine.

In March 2020, Rebecalicia's brother died. Her husband then died the day after their wedding in July. Rebecalicia testified that after July, she was simply too grief stricken to care for Analicia on a regular basis. She later indicated that while she "could" have cared for Analicia, she thought it best for Analicia to be with the Chandlers who could fully focus their attention on her. Rebecalicia stopped seeing Analicia on the weekends. Initially, she stayed in contact with the Chandlers over the telephone, but admitted that by 2021, this contact "slowed down." However, Rebecalicia blamed the diminished contact on the Chandlers. She testified that she tried contacting them, but was never able to "get through." She also testified that she still saw Analicia sometimes, citing the incident where she briefly took Analicia to her home after Analicia hit Tonya. Rebecalicia admitted that she had not seen Analicia in the 4 or 5 months prior to the State filing its petition in December 2022, but believed that she had made efforts to do so.

Rebecalicia stated that she always provided necessary consent forms to the Chandlers when asked. She explained that the most recent consent form was late because her printer was broken.

In 2021, Rebecalicia bought a home in Lincoln. She initially had a roommate, but is now living there alone. She admitted that the outdoor area of the home is "messy" and that she has been cited by the city for having a dirty yard "numerous times." In addition, Rebecalicia explained that there were areas of her home that were locked because such areas were only used for storage. At the time of trial, she was facing a citation from the city for an unsanitary house.

Rebecalicia denied using controlled substances despite her recent charges. She testified that her depression symptoms have diminished and that in December 2022 she was ready to resume contact with and care of Analicia because she missed her. Analicia has never been physical with Rebecalicia and Rebecalicia believes that she has the ability to control Analicia's behaviors. She testified that as a former certified medical assistant and phlebotomist, she is aware of Analicia's needs as a diabetic and has sufficient medical training to care for her.

At the close of the evidence on May 17, 2023, the juvenile court orally stated its finding that the allegations in the petition were true by a preponderance of the evidence. The court explained:

> And it's very clear to the Court that [Rebecalicia does] love [Analicia] greatly. But [she] need[s] some assistance to be at a point where [she] can parent [Analicia] full time. And that's what this case is all about. This isn't a case about saying we're taking – this is not a termination proceeding. This is an issue of: Are these allegations true? Are they more likely true than not? And in the Court's view, they are.

After the hearing, the court entered an order memorializing its finding that "the allegations in Count 1 of the Petition are true and these findings are being made by the preponderance of the evidence."

This appeal followed.

## ASSIGNMENT OF ERROR

On appeal, Rebecalicia asserts that the juvenile court abused its discretion in finding that Analicia came within the meaning of § 43-247(3)(a).

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

## ANALYSIS

Before addressing Rebecalicia's arguments on appeal, we briefly review the standards governing the adjudication phase of a juvenile court proceeding. The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013). To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Justine J. et al., supra.*

Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile. See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020). The grounds relevant to this case are that the juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" and that the juvenile is "in a

situation . . . dangerous to life or limb or injurious to the health or morals of such juvenile." See § 43-247(3)(a).

As to the ground alleging that the juvenile lacks proper parental care, the Nebraska Supreme Court has previously explained, "proper parental care" includes "providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. . . . It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals." *In re Interest of Metteer*, 203 Neb. 515, 520, 279 N.W.2d 374, 377 (1979). See also *In re Interest of Jeremy U. et al., supra*.

In considering whether a juvenile lacks proper parental care, Nebraska Supreme Court case law has incorporated a risk of harm component. *In re Interest of Jeremy U. et al., supra*. To show that a juvenile lacks proper parental care, the State is not required to prove that the child has actually suffered physical harm, but the State must establish that, without intervention, there is a definite risk of future harm. See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). A preponderance of the evidence is the equivalent of the greater weight of the evidence, which means evidence sufficient to make a claim more likely true than not true. See *In re Interest of Vladimir G.*, 306 Neb. 127, 944 N.W.2d 309 (2020). Rebecalicia argues on appeal that the State failed to carry its burden to show that Analicia lacked proper parental care by reason of her faults or habits and that, without intervention, Analicia faced a definite risk of future harm.

Upon our de novo review of the record, we find that the State sufficiently demonstrated that the allegations in the petition were true. Accordingly, we affirm the order of the juvenile court adjudicating Analicia as a child within the meaning of § 43-247(3)(a). Specifically, we find that the State presented sufficient evidence to demonstrate that Rebecalicia failed to maintain consistent contact with Analicia and her caregivers and that such actions placed Analicia at risk for harm.

In her brief on appeal, Rebecalicia argues that the evidence presented at the adjudication hearing revealed that she had "ensured that her daughter Analicia was properly cared for, if in an untraditional way." Brief for appellant at 19. Essentially, Rebecalicia asserts that by placing Analicia in the Chandlers' care, she was making a positive parenting decision to give Analicia a stable home life. Contrary to Rebecalicia's assertions on appeal, however, the evidence presented at the adjudication hearing revealed that while Rebecalicia's initial decision to place Analicia with the Chandlers was positive, her failure to provide the Chandlers with the capability and power to provide for all of Analicia's needs resulted in Analicia being placed at risk for harm. Moreover, Rebecalicia's decision to absent herself from Analicia's life for lengthy periods of time negatively affected Analicia's mental health. When Rebecalicia learned of the difficulties Analicia was suffering due to her absence, Rebecalicia did not make any changes for Analicia's benefit. Accordingly, we do not agree with Rebecalicia's assertion that her decision to place Analicia with the Chandlers negated her parental responsibility for Analicia.

In their testimonies at the adjudication hearing, Tonya and Ralph specifically described the diminishing contact they and Analicia have had with Rebecalicia since approximately 2020. And,

although Rebecalicia blamed some of the lack of communication on the Chandlers, she did not disagree that their level of communication had diminished significantly. In 2020 Rebecalicia stopped having visits with Analicia every weekend, and began seeing her only a couple of times per year. Rebecalicia also stopped telephoning the Chandlers or immediately responding when the Chandlers reached out to her.

Rebecalicia's lack of communication became particularly problematic after Analicia was diagnosed with diabetes and had to attend regular doctor's appointments. Evidence presented at the adjudication hearing revealed that the Chandlers did not have a legal guardianship over Analicia and, as a result, had to obtain periodic delegation of authority forms from Rebecalicia to be able to take Analicia to her medical appointments. Notably, Rebecalicia did not attend a majority of Analicia's medical appointments. On two occasions in the past few years, the Chandlers were unable to obtain the necessary documentation from Rebecalicia in a timely manner. First, in 2021, the Chandlers had to seek the assistance of the Department to obtain an updated delegation of authority form from Rebecalicia because she was "unavailable" to them. In October 2022, the Department again had to become involved in obtaining a delegation of authority form from Rebecalicia. Ralph indicated that he made great efforts to obtain the form himself prior to reaching out to the Department.

While the evidence indicated that Analicia did not ever miss a doctor's appointment due to Rebecalicia's failure to timely sign updated delegation of authority forms, there was evidence that Rebecalicia's actions resulted in a risk of harm to Analicia. Analicia suffered from a serious medical condition which required regular doctor's visits and medication management. The Chandlers needed updated delegation of authority forms in order to obtain necessary medical care for Analicia. When Rebecalicia failed to timely provide the forms, Analicia was at risk of not receiving routine or emergency care.

Evidence presented at the adjudication hearing also demonstrated that Rebecalicia's absence from Analicia's life had caused or at minimum contributed to Analicia suffering from mental health issues and extreme behavioral problems. Tonya testified that around the time that Rebecalicia discontinued her regular weekend visits with Analicia, Analicia expressed her belief that Rebecalicia must hate her. Tonya informed Rebecalicia of Analicia's comment, and Rebecalicia acknowledged that she needed to do better as a parent. However, she never followed through on this. Rebecalicia failed to visit Analicia regularly, even failing to see her on her most recent birthday. Tonya described Analicia waiting for her mother by the window for a visit which never materialized. And, in December 2022 when Rebecalicia went to the Chandlers' home to ask whether Analicia could attend a religious service with her, Rebecalicia promised she would call Analicia later that evening. Rebecalicia did not call as promised. Rebecalicia's actions consistently leave Analicia feeling angry, hurt, and abandoned.

By the time of the adjudication hearing, Analicia was experiencing "horrific" behavioral problems, including perpetrating violence against Tonya and acting out physically at school. Both Tonya and Ralph opined that Analicia's behaviors were the result of her unstable and sporadic relationship with Rebecalicia. The Chandlers were exploring the possibility of placing Analicia in a group home to help control her behaviors. Rebecalicia's failure to keep in regular contact with Analicia has caused harm to Analicia's mental health. Rebecalicia knew of the harm she was causing, but failed to make any changes for the benefit of Analicia.

Upon our de novo review, we also find that Rebecalicia has failed to take appropriate steps to put herself in a position to independently care for Analicia, including, obtaining necessary training on Analicia's medical devices; learning about Analicia's behavioral problems both at home and at school; and maintaining a safe home environment.

Rebecalicia has not been trained on Analicia's diabetic medical devices. Tonya testified that while she and Ralph both attended the training sessions for these devices immediately after Analicia's diabetes diagnosis, Rebecalicia attended one session for only 15 minutes, then left. Both Tonya and Ralph described the amount of time and effort that goes into managing Analicia's devices and medications. Tonya testified that Ralph treats Analicia's medical care like a "full-time job." And, while Rebecalicia testified to her belief that she could easily manage Analicia's condition due to her past medical training, Tonya testified that Analicia's doctor indicated that even he would need training on Analicia's medical devices and specific care. Further, Bryant testified that even after the initiation of the juvenile court case, Rebecalicia has failed to complete the necessary training. Rebecalicia's failure to complete the training in a timely manner certainly presents a risk of harm to Analicia. Rebecalicia cannot independently care for Analicia and her diabetic condition without such training.

Rebecalicia has also demonstrated a lack of knowledge and insight about Analicia's behavioral problems both at home and at school. Despite being invited to do so, she has not attended any of Analicia's therapy appointments. She has not attended any meetings with Analicia's school, having given the Chandlers educational rights to handle such meetings. Moreover, during Rebecalicia's testimony, she seemed to minimize Analicia's recent behavioral problems, indicating that Analicia has never been violent with her and that she is able to control Analicia's behavior. Essentially, the evidence presented at the hearing revealed that Rebecalicia does not have an appreciation of Analicia's current physical, mental health, or educational needs. Such lack of knowledge presents a serious risk of harm not only to Analicia, but also to others.

Finally, the evidence at the hearing indicated that Rebecalicia does not currently have an appropriate home for Analicia to return to. Such evidence indicated that the outside of Rebecalicia's home is cluttered and dangerous to the extent that she has been repeatedly cited by the city for the home's unsanitary condition. The majority of the inside of Rebecalicia's home has not been adequately examined, as she keeps the upstairs and downstairs padlocked. When asked about these areas, Rebecalicia has given inconsistent answers, telling Bryant about a damaged support beam and telling the court during her testimony that such areas are only used for storage. The main living area of Rebecalicia's home was determined to be inappropriate for Analicia, as the bedroom identified as Analicia's contained drug and alcohol paraphernalia. Other evidence presented at the hearing indicated that Rebecalicia may have used controlled substances recently, given her 2021 charge. This evidence is particularly concerning given that the reason Analicia was removed from Rebecalicia's care when she was a newborn was Rebecalicia's use of controlled substances during her pregnancy. As such, any recurrent involvement with controlled substances by Rebecalicia raises concerns about an ongoing struggle with drug use.

We also note that Rebecalicia has previously had her parental rights to her older child terminated. This fact does provide both the juvenile court and this court with some insight into Rebecalicia's history as a parent. Her past struggles combined with her present actions provide a more complete picture of Rebecalicia's ability to independently care for Analicia.

In sum, the evidence presented by the State at the adjudication hearing sufficiently demonstrates that Analicia is at a definite risk of harm due to the faults or habits of Rebecalicia. While Rebecalicia found appropriate and loving caregivers for Analicia, she failed to maintain contact with those caregivers and failed to equip them to consistently monitor Analicia's serious medical condition. Moreover, Rebecalicia failed to maintain consistent contact with Analicia and has, as a result, had a negative impact on Analicia's mental health. Rebecalicia is not at this time ready to independently care for Analicia. She does not have adequate training on managing Analicia's diabetes, she is not fully aware of Analicia's mental health needs, and she does not have safe and stable housing. Given all of these factors, we do not find that the juvenile court erred in adjudicating Analicia as a child within the meaning of § 43-247(3)(a).

CONCLUSION

We affirm the order of the juvenile court adjudicating Analicia as a child within the meaning of § 43-247(3)(a).

AFFIRMED.